My name is Tyler Smith and I represent Oral Surgeons. This case involves an appeal of an order granting Cincinnati's motion to dismiss Honorable Judge Woolley. As the court probably is aware, this case is one of many across the nation seeking insurance coverage for losses connected to the COVID-19 pandemic. At the district court and in its brief, the defendant appealed to the Cincinnati Insurance Company, spends considerable time and effort arguing that the overwhelming majority of dispositive rulings by courts across the nation concerning COVID-19 business interruption insurance litigation are in favor of insurance companies and so this court should follow suit. But Cincinnati fails to acknowledge that its policy in this case is different than the policies analyzed in the overwhelming majority of cases it cites to and relies on. Cincinnati was issuing two policies in its business interruption insurance. One, policies that include the standard form language, I quote, direct physical loss of or damage to or some other variation where those specific terms in that phrase are left undefined, specifically loss, and then two policies that include a definition of loss in the insuring, which is the situation in our case. Cincinnati asked this court to group this policy in with all other standard form policies that are being routinely reviewed and analyzed across the country stemming from the COVID-19 pandemic. Cincinnati's argument on appeal falls short for two primary reasons I'd like to discuss. Counsel, is there any reported case that's focused on this, your two policies argument? No. I find it hard to put much stock in that. Actually there's, that's one of the very arguments that we're asking this court to address is that even in the cases that have found in favor of, with policy language like we have before us. I don't necessarily mean a COVID-19 coverage case, any case that's ever seized upon your notion that the fact that they issued two policies, one with a standard form and one with a definition makes a massive difference. A specific case that says that, no, I think the argument underlying that is that there's, shows why there's ambiguity in the policy that they issued to oral surgeons. A couple of cases to that ambiguity point where courts are reviewing these cases and published cases, as you're aware, and that have been briefed specifically Studio 417 and then this Derrick Williams. Where is a case that says an ambiguity can be created by looking at other policies the insurer has issues to other insurers? I thought ambiguity always turned on whether the language within the policy, considering all of its terms, exclusions, and so forth, have a clear meaning. Right. You're saying we can run out and say, well, they issue standard form and that makes this one ambiguous, or State Farm, pick another insurer. They have a different form. That makes this one ambiguous. I doubt that you have an Iowa case that would support that analysis. I make that point to say that there are, they knew that there's alternative language out there in these policies and that the authorities that are being cited on, it's really a distinguishing factor, your honor. When we look at a number of these policies and decisions across the country, they're analyzing policies that are different with different language. When we look, and that is the reason why the policy before this court is ambiguous. Let me ask you this. I know you make the argument that you have loss being defined by loss, but let's ignore that for a second. Let's just ignore the word loss for a second and say, is there any accidental physical loss, damage, whatever you want to call it, at all in this case, because that's what it's defined as. I'm just trying to figure out if there's anything physically lost or damaged. According to the court and Derek Williams, we cited in a response or supplemental authority filing rule 28, they found that when looking at this exact same policy, that it's easier to say what loss does not mean than what it does mean. One problem is that the policy uses the term loss, okay, define the term loss, and then they went into a discussion of physical loss or physical damage, meaning, and this is, I think, the argument, that Cincinnati and other carriers are arguing that loss and damage mean a couple of things. Are they synonyms? Do they mean differing things? Well, let's suppose they mean different things, so damage, loss is complete loss of property, so fire burns the whole place down. Damage might be somebody throws a brick through the window, and therefore, if you're running a dental practice, maybe that creates hygiene problems, so that would be the physical damage, so let's assume they mean different things. I still don't know where that gets you. I think that further proves why this policy is ambiguous in saying that if loss means total loss, the policy itself defined accidental physical loss or accidental physical damage. The argument is loss is a deprivation of use of that physical premise, which was the oral surgeon's ... Judge Loken, I'm not hearing you. No, the initial question from Judge Stras was, what was the physical loss or the physical damage? What was the physical damage? Oh, I guess we're getting into ... No, accepting that, yeah, they're different words, so you would be inclined to give them different meanings, and Judge Stras just did that, and then back to it, and you say, well, that shows it's ambiguous, and I say, I'm asking you to go back to his initial question, what was the physical damage here? The physical damage was the COVID-19 community spread of the virus. Now, the insurance policy that oral surgeons had included loss. It's a defined phrase, or it's a defined term. Because they opted to define that, oral surgeons' argument is that they have removed this policy from some of the traditional policies out there that you're seeing all over the country that include the collective phrase, direct physical loss of or damage to, and I think that goes ... The problem I'm having, I'm going to push you on this, because I think oral surgeons suffered a loss in the colloquial sense, right? Oral surgeons lost money, right? They lost money. But what I'm not finding, I'm still not finding anything physical that they lost. Money does not suffice as a physical loss in insurance parlance, and so there has to be something physical. Somebody stole a machine, there was a brick thrown through a window, the roof was damaged in some way. I'm just trying to ... I guess I'm trying to figure out, is there anything physical in this case at all, in the record, that would, at least in my view of the case, would support the argument you're making? Right. Well, Judge, at one level, this was a motion to dismiss, and so it was done before any discovery was taking place. I will point to the complaint and the petition. I think paragraph number nine and paragraph 21 of our complaint suggested that there could be direct physical damage or loss concerning this COVID-19 community spread as an allegation. I think that's an interesting point you make, because in one of the cases that was decided and relied on, it's the Mama Jo's case. That case is an 11th Circuit case, and it's not concerning COVID-19 business interruption, but it's being cited across the country by carriers for the same proposition that there's no physical ... a virus can't cause a physical damage to a property because it can be cleaned. In that case, it was dust. I think the point to your question, Judge, is that in that case, there was a motion for summary judgment, and there was expert testimony and a large amount of discovery that took place to determine, to try to sort through, was there physical damage or physical loss that would trigger the coverage under that policy? The other additional point of that policy was different. I think at the end of the day, oral surgeons, and we argue in our brief, and we argue here that the policy that we're looking at is different than- Was there any evidence ... Let me ask you this, which is the argument you're making. Is there any evidence that people actually showed up at the practice and created a risk of spreading the virus? For example, some positive set of COVID-19 patients, perhaps a family came, and that caused the whole place to have to shut down for three weeks or anything like that, which may be in a creative way, you could say, was some sort of physical loss. Right. Well, at this stage, I mean, I can't represent ... I can't- Was it alleged? Was it alleged? The allegation, the extent that it was alleged would have been that the limitations and the virus-imposed limitations on paragraph nine that caused by the physical damage or loss of the novel coronavirus COVID-19, specifically it was not alleged, Judge, that a family came to the office. I think to that point, and briefly, I know I'm running to my time where I want to reserve some room for response, but I would propose that because discovery hasn't taken place, we can't ... The evidence before the court of whether physical alterations to the property took place hasn't even been determined because as we know, what was very common in the COVID-19, there was social distancing, various changes that would have been taking place to properties to help stop that COVID spread, including measures. I'm not saying that we've alleged that the property had to be renovated necessarily, but I'm saying that because of orders and recommendations from local boards that certainly measures were taken on the physical premises of this property. To that point, practically speaking, they were taking temperatures, I'm sure, for a while there outside of the premise. Let me ask you this, counsel. I'm looking at Promotional Headwear International in the District of Kansas, which as I read it, was the grant of a motion to dismiss in favor of Cincinnati on the same issue with a policy that had the precise same terms and a lengthy opinion, which relied in part on a circuit cases. Yes. Obviously, you're telling us not to follow that. What's wrong with the analysis? I knew you were going to ask me about that case, counsel, or judge. It cites my Penta decision, which I think is quite relevant to the, obviously, a different issue, but the analysis is quite similar. Absolutely. Promotional Headwear, in our view, I look to two counters to that. One, the court there jumped directly to the fact that it's a direct loss to covered property. I don't see, in reading that case, I don't see that they discussed an argument that loss was ambiguous because they defined, or I don't see an argument where they used the dictionary. Definition before acknowledging, I guess, that it was ambiguous. Oral Surgeon's argument is that this case is ambiguous, or the definition of loss in this case is ambiguous, and therefore, you need to use the dictionary definitions to figure out what accidental physical loss or accidental physical damage mean. To that point, the Eighth Circuit invoked versus State Farm held that several courts have examined the issue. In that case, it was based on, I'm running out of time, I want to hit this, that several courts have examined the very issue, similar circumstances, and have reached differing conclusions supports the conclusion that the phrase is ambiguous. I guess my point is that Williams, Derrick Williams, Studio 417, they've done the exact opposite analysis and reached the exact opposite conclusion as the promotional headwear case, and according to Volk v. State Farm, Eighth Circuit from last year, that's enough to show that it's ambiguous. I'll yield my time, and I apologize I went over there. No, no, that was very responsive. Thank you. Mr. Litchfield? Good morning. May it please the court. My name is Daniel Litchfield. I represent the defendant, Apolli, the Cincinnati Insurance Company. To be sure, these are extraordinary times, but even in extraordinary times, we have the law and the principles of the law, including the law of contracts. This is a contract case. When read and interpreted as Iowa law requires, this contract does not supply any coverage. Fundamentally, the petition, and I just look back at it based on what we just heard, but I'll stand by this. Fundamentally, the petition asserts that Oral Surgeon's appointment book went dark in places because of the order of the governor. They didn't have as many appointments as they ordinarily would have because of the governor's order. There's nothing physical about that. Moreover, although I think there was a little bit of an allusion to this idea, I see no place in the petition, any allegation that the virus was even present on the premises at any time. And not that that would be the be-all and end-all, but I just want to make sure that that is clear. To be sure, we're dealing with insurance contract language here, and the operative phrase that the parties are disputing is direct accidental physical loss or accidental physical damage to property. The words need to be read together. We know that from the basic Iowa law on how to read a contract, including an insurance contract. The words need to be read in context. I believe that the gist of all of Oral Surgeon's arguments, including the arguments about the textual arguments about the policy, the gist of those arguments is to find some way to read the word physical out of that phrase. And that would be inappropriate, and that would be inappropriate based on a long line of Iowa cases about how the contract is to be read. The plaintiff has raised these arguments about differences in wording between Cincinnati's policy and policies issued by other insurers. And we don't think that that is material at all, but let me make a couple of points about it. First of all, assuming for argument's sake that we would only look at cases that address the exact language that is seen in this Cincinnati policy in this case, as of a couple of hours ago, there are now 22 decisions involving that language and Cincinnati Insurance Company as a defendant that have favored Cincinnati, that is, dismissed complaints based on the absence of direct physical loss or damage to property. We have cited a large number of those cases to the court in our brief and the table attached to our brief and our Rule 28J supplementations to all of that. So those precedents, at the very least, even assuming for argument's sake that there's any traction to what the oral surgeon is arguing, those cases stand as well-reasoned precedents, and promotional headwear is one of the best-reasoned precedents of all of those cases. I submit it as a particularly academic and thorough exposition of the issues here. Now, even if one were to look at cases where the policy language is not precisely word-for-word the same as Cincinnati's policy language, I don't think anybody could disagree that the language in these other policies is substantially similar language. It's substantially similar because it utilizes in the phrase in these other cases the words physical and loss and damage. Those are among the words in the phrase at issue in this case, and all of those words exist in the cases and the precedents that Cincinnati relies on, a large number of precedents, to be sure, as counsel acknowledged. The Iowa law in this area not only includes the generalized law of how to read a contract that I alluded to already, but it includes a line of cases that directly address the Words to that effect, slight differences to be sure in some of the policies, but all those key words in the phrases involved in these cases. We start with Milligan, which is an appellate decision from Iowa, which the holding is that loss of use is not direct physical loss or damage. The Infogroup case from the Southern District, again, following Milligan, holds that loss of use is not direct physical loss or damage. We then have the four cases from the Southern District that address COVID-19 coverage cases, Palmer, Whiskey River, Drolman, and then a state case called Wakanda, and then add on top of that the District Court's decision in this case. Those cases as a whole are in edifice, showing us what Iowa law is when we get to the issue of whether loss of use should be insured under a policy written like our policy or in any substantially similar way. All of those cases hold in favor of the proposition that Cincinnati asserts. All of those cases should be seen as highly persuasive, and they have a touchstone in both the federal and the state courts, which I think is also very powerful in trying to discern what the Iowa law is here. We're not dealing with any case to the opposite proposition, and I think that's also important. The Iowa law on interpreting insurance policies requires that meaning be given to all parts of the policy, that we don't excise a word here and there in order to get to an outcome. The word physical has to be accounted for. So does the definition of something called the period of restoration. The period of restoration is just the period of time. Counselor, let me interrupt with a question I'm not familiar with. Business interruption coverage in this case is described as secondary to a particular cause of loss, and that's the context in which I've encountered it in the past. Do you know, does your client offer what I might call an all risk business interruption coverage? I'm not aware of my client offering a standalone business interruption only coverage. The coverage I'm familiar with is the one that we see in this case, which is it's related to the core coverage for the direct physical loss or damage to property. The paradigm would be a fire. To go back to Judge Strauss's earlier example, if you have a complete loss of the building, it's going to take the policyholder a period of time to get on their feet. I was just curious. I can't definitively say that they don't, but I've represented them for nearly 30 years, and I'm not aware of one, and I haven't dealt with one. So, back to Iowa law, if we look at all parts of this policy and look at the definition of period of restoration, it requires that the period end when there's a rebuilding, replacement, or repair of the property. That fits very nicely with the requirement of physicality, physical loss, or physical damage. It doesn't fit at all with the idea that because there's a lessened number of appointments at a medical practice that there would somehow be coverage when the requirement is for direct physical loss or damage. Council mentioned the national law, and I agree. The overwhelming majority of cases nationally, both before the pandemic and during, support Cincinnati's position here, particularly the pandemic cases. Frankly, I've never seen anything like this, that in a year, over 100 precedents have developed, and the vast majority of those favor Cincinnati's position here. Should the court rule for Cincinnati in Cincinnati's favor because of the count of cases? No, not just because of that, but it's because of the underlying reason why that count of cases is where it is. It's where it is because if one is looking at the ordinary meaning of these words and reading them in context and not kicking out the word physical and ignoring it because it might be inconvenient to a policyholder's wanted outcome, if one follows those procedures which are basic in core insurance law, state-to-state in America, it's no surprise. It should be no surprise to anybody that the case count so overwhelmingly favors Cincinnati as opposed to policyholders. A mention was made of the Pentair case, and that's important. That's a pre-pandemic case, along with the source food decision, also from this circuit. Now, to be sure, both of those cases apply Minnesota law and do not apply Iowa law. But reading those cases, one does not discern a difference in the basic principles of insurance contract law as between Minnesota and Iowa as elucidated by the Supreme Courts of each state. And without a difference in those basic principles, I'd submit that it follows logically and naturally that the outcome in source food and Pentair with respect to Minnesota law ought to apply to the outcome here simply because it is so well-reasoned, both cases, and so well-established at this point. And Judge Loken is correct that both Pentair and source food have been repeatedly cited by these many cases that support Cincinnati around the country. Indeed, we cited in the table to our brief, combined with our Rule 28J supplements, 86 COVID coverage cases just in the COVID arena alone that support Cincinnati's position here, and a large number of those cases cite and rely on source food and Pentair, as did promotional headwear. These cases span the nation from coast to coast, from Florida to Minnesota, and nearly all states in between. Council mentioned Studio 417 as a case that should be followed, and we strongly disagree with that proposition. There are a number of points to be made here. First, at the end of the decision, Studio 417 acknowledges that it expects legal developments would come, and that those developments could possibly overtake the ruling in Studio 417, and boy, have they. Courts have repeatedly been asked, as this court is being asked, to follow Studio 417, and they just don't do it. Some comment further, the Bluegrass Oral Health decision from the Western District of Kentucky stated that Studio 417, quote, makes no sense. The legal seafoods case from the District of Massachusetts stated that the Studio 417 case is an outlier, and it's certainly been treated by an outlier, as one can see in case after case. Second, the case is erroneous in that it purports to be relying on two Missouri law decisions, Hampton and Mayo. Hampton is a decision from this circuit, but in Hampton, there was physical loss or damage to the building. It was in collapse, and that's a key fact that ought to be accounted for in whether Hampton signals that mere loss of use alone should be covered under a policy like this. Mel, which is from the Eastern District of Missouri, actually involves wildly different policy language, and that was acknowledged by Studio 417. The policy there expressly stated that it covered loss of use of property in the absence of direct physical loss or damage, and that makes it a precedent that should not support Studio 417. Promotional headwear, which was mentioned a little bit ago. The chief judge of the District of Kansas, who wrote that opinion, stated that another problem with Studio 417 was that it relied on allegations that failed to raise a right of relief above the speculative level, and that criticism can be seen running through multiple other cases addressing Studio 417. At bottom, I don't think it's fair to say that the district court here erred by not following Studio 417, when, in fact, that court's opinion, rather than being consistent with an outlier that had these analytical issues, the decision in the court below is consistent with the well-reasoned, well-developed body of case law, both in Iowa and nationally, and it is not appropriate to reach the conclusion that it should have followed Studio 417, which it was invited to do and chose not to do. The or argument was alluded to a moment ago, and let me address that. This is the idea that because the language says direct physical, accidental physical loss or accidental physical damage, because the word or is there, that somehow that creates a problem for Cincinnati. It does not. The argument being made by oral surgeons seems to assume that or always means either or but never both, but I think there are a plethora of examples that that's not the only way to read a phrase where the word or is used. There certainly is some separation, and as Judge Strauss pointed out, there's a distinction between a loss, a total loss, where the building is gone and damage, the brick through the a good understanding of how this phrase ought to be read. I recently saw the word or in the process of applying to become a member of another U.S. District Court bar. Their rules stated that we should refer to the court as judge or your honor. It never occurred to me that that was ambiguous because of the use of the word or or that somebody is a judge is not a your honor or vice versa. I think that the word or makes perfectly good sense as used here. Bottom line, Amicus, the American Property Casualty Insurance Association, presented a lot of data and information about what the implications of the decision here could be to Iowans and Iowa insurers. The district court was correct in its decision, and we ask that this court affirm that decision. Thank you, Mr. Smith. The case has been thoroughly briefed and well argued, and you've used up your time, but and I think we understand the issues, but I'll give you a minute if you have something to rebut that you should hear. Could I take, yeah, could I have a minute? Yes. I'll move through quick. First, just to respond to a couple of these arguments. One, the period of restoration argument that has been posited by Cincinnati, in oral surgeon's That only further supports our argument that looking at this whole policy, a couple of things. I don't think that was argued this morning. That was in the brief. This is rebuttal to the oral argument. He didn't, I'm pretty sure he made a comment about the period of restoration and how that. I'll move on. Two, I think, and as I talked about earlier, the Pentar and source food cases do not have to be impacted by this case. The policy language before the court here is different than it was in Pentar and source food. Finally, the public policy implication goes to that. The court's only looking at a pretty narrow policy here and the implications that are supported by amicus are, in oral surgeon's view, are inconsequential. With that, my time's expired. I thank you all for your time. Well, thank you, counsel. The case has been thoroughly briefed and argument has been well done and has been helpful and we'll take it under advisement. Thank you, your honor. Thank you.